**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **PRISCO E. ENTINES**,<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES OF AMERICA, et al.**,<br><br>Defendants. | Case No. 13-cv-00438 (CRC) |

**MEMORANDUM OPINION AND ORDER**

The Reverend Prisco Entines was born in the Philippines in 1943, a time when the islands were governed specially as a U.S. territory. The statutory framework in place classified him first as a non-citizen national of the United States, and later as an alien when the Philippines became a self-governing nation-state. Entines has since become a naturalized U.S. citizen. But he contends that this exercise was legally unnecessary, because he has in fact been a citizen since birth under the Fourteenth Amendment's Citizenship Clause. Alternatively, Entines argues that he inherited U.S. citizenship through his Philippine-born father, who swore an oath of allegiance to the United States and took up arms on its behalf during World War II.

The government has moved to dismiss Entines's complaint. Because the D.C. Circuit recently ruled out the possibility of birthright citizenship for Philippine natives born during that nation's territorial period, and because outward expressions of allegiance such as military service cannot create an extra-statutory entitlement to U.S. citizenship, the Court must grant the government's motion.

## I. Background

At the end of the Spanish-American War, Spain formally agreed to cede the Philippine Islands to the United States. See Treaty of Peace Between the United States and the Kingdom of

Spain, art. III, Dec. 10, 1898, 30 Stat. 1754 ("Treaty of Paris"). The transfer became effective upon the exchange of ratifications on April 11, 1899. Cabebe v. Acheson, 183 F.2d 795, 798 (9th Cir. 1950). Except for those Philippine inhabitants who elected to retain their pre-war Spanish allegiance, all residents of the Philippine Islands would be "held to have renounced [that allegiance] and to have adopted the nationality of the territory in which they may reside." Treaty of Paris, art. IX, 30 Stat. at 1759. The treaty also specified that "[t]he civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress." Id.

Congress clarified the political status of Philippine inhabitants in the Philippine Organic Act of 1902, deeming those who had resided in the Philippines since April 11, 1899—as well as their children—to be "citizens of the Philippine Islands . . . entitled to the protection of the United States." Act of July 1, 1902, ch. 1369, 32 Stat. 691, 692. But that statute also provided that the U.S. Constitution and laws did not apply to the Philippines.[1] Id.; see also Hooven & Allison Co. v. Evatt, 324 U.S. 652, 678 (1945) (explaining that the Philippine Islands were then "territories belonging to, but not a part of, the Union of states under the Constitution"). On July 4, 1946, the United States formally "recognize[d] the independence of the Philippines as a separate and self-governing nation." Independence of the Philippines, Proclamation No. 2695, 11 Fed. Reg. 7517 (July 4, 1946). President Truman's proclamation thus ended the Philippines' forty-seven-year status as an American territory. Inhabitants of the Philippines were thereby "divested of their status as United States nationals." Licudine v. Winter, 603 F. Supp. 2d 129,

[1] Specifically, it declared that "[t]he provisions of section eighteen hundred and ninety-one of the Revised Statutes of eighteen hundred and seventy-eight shall not apply to the Philippine Islands." Id. Under § 1891, the Constitution and laws of the United States were, by default, to "have the same force and effect within all the organized Territories, and in every Territory hereafter organized as elsewhere within the United States."

135 (D.D.C. 2009). So from 1899 until 1946, Congress never classified Philippine natives as U.S. citizens. This treatment is consistent with the current statutory framework for determining territorial inhabitants' nationality at birth. See 8 U.S.C. § 1408(1) ("[T]he following shall be nationals, but not citizens, of the United States at birth: . . . [a] person born in an outlying possession of the United States.").

Plaintiff Prisco Entines was born in the Philippines in 1943, three years before it became an independent nation. Compl. ¶ 12.[2] His parents were born there in 1905 and 1907, also during the U.S. territorial period. Id. ¶ 1. Entines's father, Private First Class Enrique Entines, enlisted in the U.S.-organized Philippine Constabulary in 1927 and served continuously for nearly two decades. Id. He swore an oath of allegiance to the U.S. Constitution and flag upon induction into the U.S. Armed Forces in the Far East. Id. Entines's father died in the line of duty in 1945. Id. U.S. law reclassified Entines as an alien when the United States relinquished control over the Philippines in 1946. He became a naturalized U.S. citizen in December 1992, Pl.'s Surreply Opp'n Defs.' Mot. Dismiss ("Surreply") 2, and now resides in California.

Entines filed his Complaint on April 3, 2013. He asks this Court to issue a declaratory judgment stating that the U.S. Constitution entitles him to birthright citizenship, for either of two independent reasons. First, he contends that Fourteenth Amendment to the U.S. Constitution "*automatically* conferred instant, native-born US citizenship on US National[] Filipinos" born between 1899 and 1946. Compl. ¶ 7. Under this reasoning, both Entines and his parents would have been lifelong U.S. citizens under principles of *jus soli* ("right of the soil"). A duplicative count clarifies the thrust of Entines's argument: that the Philippine Organic Act was unconstitutional insofar as it classified persons born in the Philippines between 1899 and 1946 as

[2] The Court accepts the Complaint's factual allegations as true for purposes of the present motion to dismiss.

U.S. nationals rather than U.S. citizens. Compl. ¶¶ 30–31. Alternatively, Entines argues, soldiers in his father's position "acquired US native-born citizenship at the moment they submitted themselves to the supreme authority of the US President as Commander-in-Chief of the US Armed Forces." Id. ¶ 19. On this view, Entines derivatively obtained his father's "inherently war-earned" citizenship status at the time of birth. Id. ¶ 35.

Entines alleges that this erroneous classification deprived him and his family of quantifiable monetary benefits. Specifically, if the law had regarded his father as a U.S. citizen from at least the moment when he swore his oath of allegiance, both "the surviving widow [and] her orphaned children" would have been entitled to "Veterans, Social Security concurrent benefits, rights and other privileges." Id. ¶ 2; see also Pl.'s Surreply 8–10 (alleging precise or estimated sums that Entines and his family ought to have received in the form of wartime dependents' allowances, Death Indemnity Compensation benefits, Social Security survivors' benefits, funeral and burial expenses, educational benefits, and life-insurance benefits).

The government has moved to dismiss Entines's Complaint. It argues both that Entines lacks standing to bring this suit, and that the case is moot, because he is already a U.S. citizen. Since the relief he seeks is a declaration of entitlement to lifelong citizenship, the government urges, his alleged injury is not redressable. Mot. Dismiss 8. The government also contends that Entines's merits argument is foreclosed by precedents from this and other jurisdictions. Id. at 9–15. On November 11, 2013, the Court issued an order staying all proceedings in this case pending a final decision from the D.C. Circuit in a similar case. That decision has since been issued in the case captioned Tuaua v. United States, 788 F.3d 300 (D.C. Cir. 2015). Tuaua held that the Fourteenth Amendment's Citizenship Clause does not guarantee birthright citizenship to persons born in the island territory of American Samoa. Id. at 302. In a recent status report, the

government argues that even if Entines had standing to pursue the relief he seeks, the D.C. Circuit's Tuaua decision "would control this Court's analysis of whether Plaintiff is a birthright citizen under the Fourteenth Amendment." Joint Status Rep., Jan. 15, 2016, ECF No. 17. The plaintiffs in Tuaua filed a petition for a writ of certiorari with the Supreme Court on February 1, 2016, but they have not moved to stay the D.C. Circuit's mandate in the interim.

## II. Standard of Review

On a Rule 12(b)(6) motion for failure to state a claim, a court must assess whether the complaint alleges sufficient facts that, accepted as true, state an entitlement to relief that is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A complaint's factual allegations must be construed "in the light most favorable to the plaintiff." Hammel v. Marsh USA Inc., 79 F. Supp. 3d 234, 238 (D.D.C. 2015). Yet "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Harris v. Dist. of Columbia Water & Sewer Auth., 791 F.3d 65, 68 (D.C. Cir. 2015) (internal quotations omitted). A complaint that presents merely "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Nonetheless, at the motion-to-dismiss stage, *pro se* filings are held to "less stringent standards than formal pleadings drafted by lawyers." Cutler v. U.S. Dep't of Health & Human Servs., 797 F.3d 1173, 1179 (D.C. Cir. 2015) (quoting Erickson v. Pardus, 551 U.S. 89, 94 (2007)).

**III. Analysis**

A. Standing and Mootness

As a threshold matter, the government insists that a declaration of birthright citizenship would be "meaningless" in this case, because "Plaintiff is already a U.S. citizen." Mot. Dismiss 8. But the government ignores the tangible reason why Entines seeks such a declaration—it would allegedly entitle him to various types of retroactive monetary relief, "[i]ncluding, but not limited to the unduly delayed and 50% reduced VA Death Indemnity Compensation . . . and Social Security concurrent benefits, rights and other privileges enjoyed by US native-born WW2 Veterans, Widows and Orphans." Compl. ¶ 1; see also Pl.'s Surreply 8–10 (itemizing these alleged benefits more concretely). The government does not respond to Entines's contention that the family of a fallen citizen-soldier would have received certain financial support from the U.S. government that Entines and his family did not. Especially given the liberal pleading standard applicable to *pro se* plaintiffs, the Court finds that Entines has plausibly alleged that a declaratory judgment would facilitate the remittance of wrongfully withheld funds. Entines accordingly has standing to request a declaratory judgment that the Constitution entitled him to birthright citizenship, and this case is not "moot based upon his naturalization as a U.S. citizen." Mot. Dismiss 8.

B. Whether Entines's Birth in the Philippines Entitled Him to U.S. Citizenship

The Fourteenth Amendment's Citizenship Clause provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States." U.S. Const. amend. XIV, § 1. In Entines's view, he was "born . . . in the United States" for purposes of this clause because of his birth in a U.S. territory. The Court need not conduct its

own textual and historical analysis on this issue, for the D.C. Circuit's recent Tuaua opinion forecloses Entines's argument.

Tuaua held that "the Citizenship Clause does not extend birthright citizenship to those born in American Samoa." 788 F.3d at 302. American Samoa has been a U.S. territory since 1900, and persons born there are statutorily deemed non-citizen nationals—rather than American citizens—at birth. Id. As the court observed, "[p]ersons born in the Philippines during the territorial period, which ended in 1946, were likewise statutorily designated non-citizen nationals." Id. n.2. Applying the framework articulated in the so-called Insular Cases, Tuaua explained that in "unincorporated territories"—those, like American Samoa, not being held with an eye toward eventual statehood—only "fundamental" constitutional rights apply of their own force. Id. at 306 (citing Commonwealth of N. Mariana Islands v. Atalig, 723 F.2d 682, 688 (9th Cir. 1984)). This designation "extends only to the narrow category of rights and 'principles which are the basis of *all* free government.'" Id. Tuaua specifically held that territorial birthright citizenship is not "so basic as to be integral to free and fair society," because "numerous free and democratic societies principally follow *jus sanguinis*—'right of the blood'—where birthright citizenship is based upon nationality of a child's parents." Id. at 308.

In a footnote to its Tuaua opinion, the D.C. Circuit disposed of Entines's precise challenge here: "Despite Appellants' contentions to the contrary, there is no material distinction between nationals born in American Samoa and those born in the Philippines prior to its independence in 1946." Id. at 305 n.6. As a result, "[t]he extension of citizenship to the American Samoan people would necessarily implicate the United States citizenship status of persons born in the Philippines during the territorial period." Id. This Court must follow this crystal-clear directive from the D.C. Circuit.

Tuaua also warned that "vast practical consequences" would attend a contrary ruling, given the multitude of lower-court decisions holding that Philippine natives are not entitled to birthright citizenship under the Fourteenth Amendment. Id. This Court has already so concluded. See Licudine, 603 F. Supp. 2d at 134 ("[B]irth in the Philippines during its territorial period does not constitute birth in the United States for purposes of the Citizenship Clause of the Fourteenth Amendment."); see also Nolos v. Holder, 611 F.3d 279, 284 (5th Cir. 2010) (holding that persons born in the Philippines between 1899 and 1946 did not become U.S. citizens at birth); Lacap v. I.N.S., 138 F.3d 518, 519 (3d Cir. 1998) (per curiam) (same); Valmonte v. I.N.S., 136 F.3d 914, 920 (2d Cir. 1998) (same); Rabang v. I.N.S., 35 F.3d 1449, 1454 (9th Cir. 1994) (same). The D.C. Circuit was aware of these decisions and consciously chose not to depart from them. Because this Court must follow Tuaua's unequivocal instruction, it holds that neither Entines nor his parents were entitled to birthright citizenship by virtue of having been born in the Philippines during its territorial period.

### C. Whether Entines's Father Became a Citizen Through His Military Service

Alternatively, Entines maintains that he became a U.S. citizen at birth by inheriting his father's "inherently war-earned" citizenship. Compl. ¶ 35. Enrique Entines swore an oath to uphold the U.S. Constitution and laws before joining the U.S. Armed Forces in the Far East and perishing in the line of duty. Id. ¶ 1. The Court deeply admires Private Entines's gallantry, and it sympathizes with the Entines family's resulting struggles. But the law is clear that service in the U.S. armed forces does not alone transform the arms-bearer into a U.S. citizen.

Entines has cited no statute mandating such a result, and the Court is aware of none. True, Congress has repeatedly relaxed certain statutory naturalization requirements for non-citizen veterans in "establish[ing] a uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4.

For example, during World War II, Congress permitted "any person not a citizen" to petition for naturalization without having filed a declaration of intention or resided in the United States for the requisite statutory period. Act of March 27, 1942, Title X ("Naturalization of Persons Serving in the Armed Forces of the United States During the Present war"), ch. 199, 56 Stat. 176, 182. These specific dispensations represent Congress's considered judgment about how military service would accelerate the acquisition of U.S. citizenship. Entines's argument would render this careful calibration meaningless.

Moreover, several federal courts of appeals have held that swearing an oath of allegiance, serving in the U.S. military, and otherwise manifesting fidelity to the United States do not instantly transform someone into a U.S. national. See Ramos-Garcia, 483 Fed. App'x 926, 934 (5th Cir. 2012) ("This Court, like several of our sister circuits, has rejected the argument that military service and the taking of the oath of allegiance make a person a national of the United States."); Dragenice v. Gonzales, 470 F.3d 183, 189 (4th Cir. 2006) ("[T]he oath administered in connection with military service cannot alone confer national status . . . ."); Reyes-Alcaraz v. Ashcroft, 363 F.3d 937, 938 (9th Cir. 2004) (holding that "service in the armed forces of the United States, along with the taking of the standard military oath, does not alter an alien's status to that of a 'national'"); cf. Marquez-Almanzar v. I.N.S., 418 F.3d 210, 218–19 (2d Cir. 2005) (holding that not even a "manifestation of 'permanent allegiance' to the United States" qualifies one as a U.S. national). If these acts cannot convert their doers into U.S. nationals, much less do they entitle someone to the far more precious reward of citizenship. After all, an "oath of allegiance lasts only as long as the duration of the military service," which is necessarily "temporary by nature." Dragenice, 470 F.3d at 188. But every American citizen has "a

constitutional right to remain a citizen" until death "unless he voluntarily relinquishes that citizenship." Afroyim v. Rusk, 387 U.S. 253, 268 (1967).

## IV. Conclusion

The Court acknowledges that triumphal tales of American territorial expansion cannot be divorced from this nation's sad history of legally subordinating groups perceived to be racially inferior. Not until 1946, for example, did Congress deem "Filipino persons or persons of Filipino descent" racially eligible to become naturalized citizens. See Act of July 2, 1946, ch. 534, 60 Stat. 416.[3] But the Court today gives no continuing legal effect to the racial classifications of an earlier era. It instead implements two principles that are currently binding law: the D.C. Circuit's holding in Tuaua that birthright citizenship does not extend to persons born in unincorporated territories, and the settled principle that service in the U.S. military—absent compliance with statutory naturalization procedures—does not alone transform an alien or U.S. national into a U.S. citizen.

For the foregoing reasons, it is hereby

**ORDERED** that the government's [2] Motion to Dismiss Plaintiff's Complaint be **GRANTED**. It is further

**ORDERED** that this case be **DISMISSED**.

This is a final, appealable order.

**SO ORDERED**.

---

[3] An 1918 statute extended the privilege of naturalization to "[a]ny native-born Filipino" of age twenty-one or older who had served for at least three years in "the United States Navy or Marine Corps or the Naval Auxiliary Service." Act of May 9, 1918, ch. 69, 40 Stat. 542. But this narrow carve-out did little to alter the generally applicable statutory baseline that had existed since the beginning of the Republic—that candidates for naturalization be "white." Act of March 26, 1790, ch. 3, 1 Stat. 103.

CHRISTOPHER R. COOPER
United States District Judge

Date: February 5, 2016